Filed 3/18/26  Greenville Ranch v. Bristol Retail XV CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| GREENVILLE RANCH, LLC, et al., | |
| Plaintiffs and Respondents, | G064903 |
| v. | (Super. Ct. No. 30-2024-01381038) |
| BRISTOL RETAIL XV, LLC, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of Orange County, Layne H. Melzer, Judge. Affirmed.

Cox, Castle & Nicholson, Edward F. Quigley and Cathy T. Moses for Defendant and Appellant.

Bolstad Law Group and David C. Bolstad, for Plaintiffs and Respondents.

Defendant Bristol Retail XV, LLC appeals from an order confirming an arbitration award that determined the fair market value of a retail shopping center. Bristol contends the trial court wrongly deemed the award final and denied its request to vacate the award. We hold the award was final despite Bristol's ongoing correction requests. We affirm.

FACTS

Bristol rents the land underlying a Santa Ana retail shopping center from plaintiffs Greenville Ranch, LLC and co-owners (the landlord). Their lease required an adjustment of rent in 2021 to account for any change in the land's fair market value. Calculating the adjustment required three appraisals of the value, followed by averaging the two closest values. The landlord's and Bristol's chosen appraisers valued the land at $37.8 million and $22.7 million.

The landlord and Bristol selected Adam Bogorad of CBRE as the third appraiser, who issued a September 30, 2023 report valuing the land at $40.9 million. Bogorad e-mailed his report to the parties' appraisers, stating: "I have completed my appraisal report and you can find it attached. . . ." His report stated: "CBRE, Inc. has prepared an appraisal" that "sets forth our opinion of [the] fair market value of the subject land to assist in the rent re-setting process." The report's analysis opened with "the market value of the subject is concluded as follows," and then walked the appraisers through Bogorad's "final value conclusion." Bogorad's delivery of his report concluded: "I appreciate the opportunity to have been able to participate in this process and work with both of you."

The report contained a section titled "Assumptions and Limiting Conditions," noting that CBRE relied on the accuracy of the parties' submissions. Paragraph 4 stated: "CBRE has assumed that all documents,

2

data and information furnished by or behalf of the client, property owner, or owner's representative are accurate and correct . . . ." It listed examples of the party-supplied "data and information" upon which CBRE relied: "numerical street addresses, lot and block numbers, Assessor's Parcel Numbers, land dimensions, square footage area of the land, dimensions of the improvements, gross building areas, net rentable areas, usable areas, unit count, room count, rent schedules, income data, historical operating expenses, budgets, and related data."

After explaining that "[a]ny error in any of the above could have a substantial impact on the Report," paragraph 4 created a 30-day window for the parties to notify CBRE of any mistakes in their submissions. It provided: "Accordingly, if any such errors are subsequently made known to CBRE, CBRE reserves the right to amend the Report . . . . The client and intended user should carefully review all assumptions, data, relevant calculations, and conclusions of the Report and should immediately notify CBRE of any questions or errors within 30 days after . . . delivery of the Report."

Eleven days after Bogorad issued his report, Bristol's appraiser sent Bogorad a letter claiming he had made 34 errors in his analysis, including using "misleading and inappropriate" comparable property sales, failing to analyze the "critical concept" of "'Growth Patterns'" for the "'subject submarket,'" and using 2023 demographic data "with no discussion of how/why it is relevant for a 2021 date of value." Thirty-one of the 34 criticisms leveled by Bristol's appraiser focused on the methodology Bogorad used in arriving at his appraisal; only three pointed out inaccuracy in the

"data and information" about the property that the parties had furnished the appraiser.[1]

Bogorad did not amend his report in any way before the 30-day notification window closed on October 30, 2023. Almost three weeks after the notification window closed, the landlord's appraiser e-mailed Bogorad on November 19, 2023 to agree that he could "revisit . . . and make any revisions" to his report. Bristol then filed a declaratory relief action in December seeking a declaration that Bogorad should "review . . . [m]aterials and additional information," "perform a residual analysis and use that analysis," and "revise the Appraisal Report . . . if he determines such revisions are appropriate." The landlord responded by "rescind[ing]" and "object[ing] to any revisit of, or redo to, [Bogorad's] appraisal."

Notwithstanding the landlord's written objection to revising the appraisal at this late date, Bogorad wrote to the parties on December 21, 2023: "In response to the correspondence I have received from both the landlord's and tenant's representatives, I will review the information provided . . . and, if necessary, revise the appraisal. I expect to report back to you mid-January."

One week later, Bristol's appraiser advised Bogorad that "both Landlord and [Bristol] are in agreement that you should not be doing any further work on the preliminary CBRE Appraisal until the Court provides further guidance."

---

[1] Complaints 13 and 19 both claimed the "site is noted as 631,105 SF, however, the subject is valued based on a size of 629,743 SF." Complaint 23 claimed that "Tax and Assessment Data" for the subject land incorrectly presented "market value[s]" as "assessed values."

The landlord filed a petition on February 20, 2024 to confirm Bogorad's appraisal report as an arbitration award. Bristol filed its response on April 2, 2024, contending: (1) the report was not a final arbitration award; (2) the pendency of Bristol's declaratory relief action prohibited confirming the report as a final award; and (3) that even if deemed final, the report should be vacated because Bogorad "exceeded his contractual authority," "failed to review . . . [m]aterials and other information provided," and "failed to provide disclosures" by Bogorad's colleague who also signed his report.

The trial court granted the landlord's petition. The court noted the parties agreed the appraisal constituted an arbitration ruling (Code Civ. Proc., § 1280, subds. (a) & (b))[2] and ruled that Bogorad's report was a final award. The court found that the report "complied fully with the ground lease," "left nothing more to be determined" and was "replete with language indicating it [wa]s 'final'. . . ." The court interpreted the report's "Assumptions and Limiting Conditions" section as indicating a "mere possibility of later 'correction.'"

The court invoked the statutory "'rule against changes in the award'" of an arbitrator beyond 30 days. (*Cooper v. Lavely & Singer Professional Corp.* (2014) 230 Cal.App.4th 1, 13–14 (*Cooper*); § 1284.) It found Bristol's response seeking to vacate the award was filed beyond the 100-day deadline for seeking vacatur. (See § 1288.2; see also *Law Finance Group, LLC v. Key* (2023) 14 Cal.5th 932, 946 (*Law Finance Group*).)

DISCUSSION

The parties dispute whether the appraisal became a final award. As they do not dispute that the appraisal was an arbitration, we agree with

_____

[2] All statutory references are to this code.

5

the trial court that the appraisal was governed by the statutes that define and constrain an arbitrator's ability and deadline for correcting an award. (See §§ 1283.4 & 1284.)

Finality is the foremost objective of arbitration. "'[T]he fundamental purpose . . . is to finally resolve *all* of the issues submitted by the parties as expeditiously as possible.'" (*Heimlich v. Shivji* (2019) 7 Cal.5th 350, 364 (*Heimlich*).) "Because the decision to arbitrate grievances evinces the parties' intent to bypass the judicial system and thus avoid potential delays . . ." (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 10), "'arbitral finality is a core component of the parties' agreement to submit to arbitration'" (*Valencia v. Mendoza* (2024) 103 Cal.App.5th 427, 440 (*Valencia*)).

To be final, an arbitration award need only "be in writing," "signed," and "include a determination of all the questions submitted to the arbitrators the decision of which is necessary in order to determine the controversy." (§ 1283.4.) The signed writing must "'(1) "determine[ ] all issues that are necessary to the resolution" of "'the controversy'" being subjected to arbitration, and (2) leave[ ] unresolved only those "issues" that are "potential," "conditional" or that otherwise "could not have been determined" at the time of that ruling.'" (*Taska v. RealReal, Inc.* (2022) 85 Cal.App.5th 1, 11.)

Bogorad's appraisal report is final on its face. It is in writing. It is signed. It determined the single issue necessary to resolve the parties' rent adjustment controversy: the fair market value of the rented land. The report did not identify any remaining work. After he "[r]espectfully submitted" it to

the parties, there was nothing left for Bogorad to do—he had "completed" his appraisal.[3]

Bristol concedes the report was in writing, signed, and determined the fair market value. Bristol contends, however, that Bogorad's report was not final because of the possibility he could correct it. They rely on paragraph 4's "Assumptions and Limiting Conditions" providing the 30-day window to notify CBRE of "any questions or errors." (Cleaned up.) Bristol also notes Bogorad agreed on December 21, 2023, to "review the information provided" before his report "and, if necessary, revise [his] appraisal," "expect[ing] to report back . . . mid-January." (Cleaned up.)

By statute, as the trial court correctly noted, there is a 30-day window for an arbitrator to correct errors in a final award. A party's request to correct a final award "shall be made not later than 10 days after service of a signed copy of the award on the applicant." (§ 1284.) The arbitrator may correct the award "not later than 30 days after service of a copy of the signed award on the applicant." (*Ibid*.)

"[A]fter that period, the trial court acquires jurisdiction over the award to confirm, correct, or vacate it." (*Cooper, supra*, 230 Cal.App.4th at p. 18.) "'The issuance of an "award"' meeting the requirements of section 1283.4 'is what passes the torch of jurisdiction from the arbitrator to the trial court.'" (*Ortiz v. Elmcrest Care Center, LLC* (2024) 106 Cal.App.5th 594, 606 (*Ortiz*).) Any "leeway granted to the parties and their arbitrator" in structuring their arbitration "does not relieve a trial court from its duty to assess for itself whether the ruling of the arbitrator at issue meets the

---

[3] The lease called for averaging the two closest appraisals "[u]pon submission of the appraisals by the appraisers . . . ." Bogorad tracks this lease language by stating his report is "[r]espectfully submitted."

7

statutory definition of an 'award.'" (*Lonky v. Patel* (2020) 51 Cal.App.5th 831, 844.)

Here, the statutory 30-day correction window closed on October 30, 2023. Bogorad made no corrections before that date. After that date, he lost jurisdiction to make corrections. (*Cooper, supra*, 230 Cal.App.4th at p. 18.) Instead, "'the torch of jurisdiction'" passed to the trial court. (*Ortiz, supra*, 106 Cal.App.5th at p. 606.)

While Bristol reasonably asserts an arbitrator should retain some inherent authority over the arbitration procedure,[4] we see three reasons why paragraph 4's 30-day notification window did not expand Bogorad's time to make corrections.

First, the 30-day notification window was much more limited in scope than Bristol suggests. By its terms, paragraph 4 of Bogorad's report applies only to corrections to errors in the basic "data and information" that the parties had provided to the arbitrator, including such things as "numerical street addresses, lot and block numbers," "dimensions," and "rent schedules." But Bristol's complaints about Bogorad's appraisal focused overwhelmingly on various aspects of the methodology Bogorad had used in preparing his analysis. Paragraph 4 therefore is almost entirely inapplicable to Bristol's complaints about the accuracy of Bogorad's appraisal.[5]

_____

[4] There is no evidence the parties agreed in advance to paragraph 4's notification provision. It is not included in the lease or Bogorad's retention agreement. Landlord's counsel represented at oral argument that the parties saw it for the first time when the report was issued.

[5] Bristol has not shown how an alleged inaccuracy of 1,362 in a 600,000+ square foot property or a single errant word in an 85-page report merits a revised valuation in any event.

Second, neither paragraph 4 nor Bogorad's report set any procedure for actually making any corrections. They did not say the award was tentative and open for further discussion.[6] They did not set a briefing schedule, hearing date, or correction deadline. Once the statutory correction date passed on October 30, 2023 without any word from Bogorad on Bristol's request, the parties had no reason to doubt the award was final. We are not aware of any legal basis—and the parties cite to none—that would have given Bogorad authority to later re-open the window in December 2023. And even if he could do that, he closed it again by "mid-January" 2024. Greenville was thus free to petition to confirm the award in February 2024—if not much sooner.

Finally, the fundamental problem with Bristol's position is that it allows for the arbitration award to never be final. The "Assumptions and Limiting Conditions" do not obligate Bogorad to make corrections or even acknowledge a correction request. If Bogorad chose not to respond at all, which would have been his right, the appraisal would be held in limbo, never

---

[6] The report here is far different than the expressly "interim" arbitration award in *Ortiz.* There, the award provided: "'This *Interim Award will become final* twenty days after service unless either side (a) points out in writing an omission to decide a submitted issue . . . .'" (*Ortiz, supra,* 106 Cal.App.5th at p. 601, italics added.) Those parties knew the award would not become final if a party objected. Here, the award was final on its face—it contained the "final value conclusion"—and was subject to correction only if the parties realized within the statutory correction time (30 days) that the "data and information" they had provided to the arbitrator was inaccurate. Besides, *Ortiz* merely allowed the arbitrator to decide an unadjudicated issue. (*Id.* at p. 602–603, 612.) "An arbitrator may amend or supplement a previously issued final award to include an inadvertently omitted ruling (*as distinguished from* an error in the intended ruling)." (Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2025) ¶ 5:439.6.)

final and always subject to correction. That's contrary to the purpose of arbitration: to expedite finality. (*Heimlich, supra*, 7 Cal.5th at p. 364; *Valencia, supra*, 103 Cal.App.5th at p. 440.)

In addition, we reject Bristol's contention that the trial court wrongly found its "response to Landlord's Petition was untimely." The deadline for Bristol to seek vacatur was 100 days from service of the final award—September 30, 2023. (§ 1288.2; *Law Finance Group, supra*, 14 Cal.5th at p. 946.) But Bristol requested vacatur in its April 2, 2024 opposition, 185 days after Bogorad's report was served.

While Bristol contends the 100-day deadline was extended by "Estoppel, Waiver and/or Laches" (cleaned up) (see *Law Finance Group, supra*, 14 Cal.5th at p. 941), substantial evidence supports the trial court's implied rejection of equitable relief. For example, on equitable tolling, the timeline shows that less than 60 days lapsed between the landlord's appraiser's November 19, 2023 e-mail agreeing that Bogorad could "revisit . . . and make any revisions" to his report, and the "mid-January" timeframe that Bogorad said he would "report back" about *possibly* revising his report.[7] Even if that entire duration is not counted towards the deadline, Bristol's April 2, 2024 vacatur request was still presented over 120 days after Bogorad's final award was served.

---

[7] There was less time—29 days—between the landlord's appraiser's November 19, 2023 e-mail and his December 18, 2023 e-mail stating the landlord "rescind[ed]" and "object[ed] to any revisit . . . or redo" of the report.

## DISPOSITION

The order is affirmed. The landlord shall recover its costs on appeal.


SCOTT, J.

WE CONCUR:


MOORE, ACTING P. J.


GOODING, J.